

American
Association of
Neurological
Surgeons

# AANS.ORG



MyAANS.org

Membership

**Career Center**

**Search:**

Keywords / Article ID

**Article ID**   find

**Home**

**About AANS**

**Annual Meetings**

**Corporate Partners**

**Education and Meetings**

**International Activities**

**Legislative Activities**

**Library**

**Media Center**

**Medical Liability Reform**

**Membership**
· Membership Requirements
  & Applications
· Apply Online
· Membership Benefits
· AANS Publications
· Membership Directory
· Surveys/Demographic
  Information
· American Board of
  Neurological Surgery
· Change Your Address
  (Login Required)
· CME Tracking
· CME accepted by AANS
  (PDF)
· Young Neurosurgeons

**Public Resources:
NeurosurgeryToday.org**

**Residents**

**Practice Management**

**About NREF and
Medical Research**

**Young Neurosurgeons**

**Subspecialty Sections /
Affiliated Organizations**

**Site Map**

**Links**

View Printer Friendly          Home | Membership | Membership Benefits

## Membership Benefits


EXHIBIT
Taylor # 1
R & D  11/7/05

· Public Outreach & Legislative
  Activity
· Scientific Information &
  Continuing Medical Education
· Practice Management Resources
· Professional Services
· AANS E-News
· Neurosurgical Research
· Member Services through AANS
  Partners
· Affiliated Organizations
· Networking & Peer Assistance
· AANS Fact Sheet

### Professional Services

- **Membership Directory**
  Take advantage of the experience of more than 6,500
  neurosurgeons and allied health professionals through
  the members-only Online Directory or AANS
  Membership Directory on CD.

- **AANS Online Career Center**
  AANS is excited to introduce its newest member benefit,
  the AANS Online Career Center. Members can search
  for positions by subspecialty, geographic location, and
  other criteria. Full job descriptions are posted with
  positions updated regularly. Members can post resumes
  and CV's, anonymously if preferred. The Center features
  fellowship listings and grant opportunities. A unique
  conference tool enables job seekers to schedule
  meetings with potential employers during events such as
  the AANS Annual Meeting.

- **MyAANS.org**
  MyAANS.org offers services personalized for each
  member , beginning with the first offering of profile
  preferences (Online Census). Once logged in using a
  username and password, members' customized
  information will appear as a profile. At any time,
  members can make changes to both census information
  and their profile. Password-protected and secure,
  MyAANS.org presents **customized CME reports**,
  enabling members to access and print a copy of their
  **personalized CME transcript** as well as certificates of
  credit from AANS-sponsored and jointly-sponsored
  meetings. Speakers and lecturers can conveniently
  prepare for AANS Meetings by completing and
  submitting customized faculty forms on this site. Watch
  for online voting and online dues-payment beginning in
  2004.

- **Fellowship Directory** for neurosurgeons

- **Subspecialty Sections** Numerous opportunities to
  become involved in subspecialty sections.

- **Expert Witness Testimony Library**
  AANS maintains an Expert Witness Transcript file that
  can be accessed by legal counsel for AANS members

involved in litigation. Contact the AANS Governance Coordinator at 847-378-0500. Other transcripts of expert witness testimony can be located at Legal Transcript Library, Inc.

- **AANS Committees**
  Opportunity to become involved on AANS Committees - Contact the AANS Governance Manager at 847-378-0500.

© Copyright 2004 AANS. All rights reserved.

Disclaimer | Privacy Statement

# Experts Currently in Our Database

Transcripts of expert testimony provided by neurosurgeons (see list at end of this file) can be obtained from the American Association of Neurosurgeons at (847) 378-0507 or visit their website at www.aans.org.

| EXPERT NAME | SPECIALTY |
|---|---|
| | |
| Abrahams, James | Neuroradiology |
| Abrams, Arnold | Internal Medicine |
| Abrams, Henry | Urology |
| Abramson, David | Neonatology |
| Acinapura, Anthony | Surgery/Thoracic Surgery |
| Ackerman, Kenneth | Internal Medicine |
| Ackert, John | Gastroenterology |
| Adler, Daniel | Neurology/Pediatric |
| Adler, Jack | Internal Medicine/Pulmonary Medicine |
| Agoliati, Glenn | Internal Medicine |
| Agus, Bertram | Internal Medicine |
| Ahn, Jung | Physical Medicine/Rehabilitation |
| Alcaide, Alexjandro | Obstetrics & Gynecology |
| Aldrete, Jorge | Anesthesiology |
| Alhadeff, Nissam | Obstetrics & Gynecology |
| Allen, Stephen | Obstetrics & Gynecology |
| Alonso, Lita | Pathology |
| Altchek, Albert | Obstetrics & Gynecology |
| Altman, Aaron | Gastroenterology |
| Ambinder, Edward | Oncology |
| Ambrus, Julian | Chemistry/Clinical |
| Amico, Frank | Internal Medicine/Addiction Medicine |
| Andersen, Murray | Surgery/Thoracic Surgery |
| Anderson, Ann | Pathology/Anatomic |
| Anderson, Charles | Neurosurgery |
| Anderson, Douglas | Psychology |
| Anderson, Paul | Neurology |
| Antonacci, Anthony | Surgery |
| Apstein, Michael | Internal Medicine/Gastroenterology |
| Aragona, James | Surgery/Orthopedic Surgery |
| Arici, Aydin | Obstetrics & Gynecology |
| Aronoff, Jeffrey | Surgery/Colorectal Surgery |
| Ashman, Phillip | Urology |
| August, David | Surgery |
| Austin, Donald | Surgery/Neurological Surgery |
| Austin, John | Radiology |
| Axe, Harold | Internal Medicine/Immunology |
| Azar, Anthony | General Medicine |
| Bacal, Darron | Ophthalmology |

| | |
|---|---|
| Sosa, Ernest | Urology |
| Sosis, Mitchel | Anesthesiology |
| Spindler, Andre | Internal Medicine/Gastroenterology |
| Spodek, Irving | Obstetrics & Gynecology |
| Sprecher, Stanley | Radiology |
| Stahl, Norman | Ophthalmology |
| Stahl, William | Surgery |
| Stanwyck, T. Scott | Surgery/Orthopedic Surgery |
| Stark, Robert | Internal Medicine/Cardiology |
| Starker, Paul | Surgery |
| Stastny, Peter | Psychiatry |
| Stefanyszyn, Mary | Ophthalmology |
| Stein, Stefan | Psychiatry |
| Stein, Todd | Surgery/Orthopedic Surgery |
| Stellar, Stanley | Surgery/Neurological Surgery |
| Stern, Robert | Obstetrics & Gynecology |
| Sternberg, Emanuel | Emergency Medicine/Surgery |
| Stewart, Charles | Emergency Medicine |
| Stewart, Constance | Pediatrics |
| Stokes, Michael | Pathology/Anatomic/Clinical |
| Stone, Peter | Surgery |
| Storm, Richard | Ophthalmology |
| Strauss, Bernard | Urology |
| Streim, Eugene | Obstetrics & Gynecology |
| Sturm, James | Emergency Medicine |
| Sullivan, Brian | Economist |
| Sultan, Leon | Surgery/Orthopedic Surgery |
| Swan, Kenneth | Gastroenterology |
| Sweeting, Joseph | Internal Medicine |
| Sze, Gordon | Neuroradiology |
| Taff, Ingrid | Neurology |
| Talavara, Wilfredo | Internal Medicine/Pulmonary Medicine |
| Tanowitz, Herbert | Internal Medicine/Infectious Diseases |
| Tarlov, Edward | Neurosurgery |
| Taub, Robert | Oncology/Internal Medicine |
| Teot, Lisa | Pathology |
| Terzian, James | Pathology/Anatomic/Clinical/Forensic |
| Thanning, Lone | Pathology/Anatomic |
| Tiersten, David | Pathology/Anatomic/Clinical |
| Tinari, Frank | Economist |
| Trieger, Norman | Surgery/Oral Surgery |
| Trowers, Reynold | Internal Medicine/Emergency Medicine |
| Tuckfelt, Mark | Internal Medicine |
| Tuerk, Milton | Surgery/Plastic Surgery |
| Tunick, Steven | Surgery/Oral Surgery |
| | |



**Exhibit 2**

A legal research tool for medical defense attorneys

Contains thousands of transcripts of
medical expert testimony



Legal Transcript Library, Inc.
PO Box 624
Ellenton, FL 34222
Marvin R. Wolpov, President

| | |
|---|---|
| Telephone (Toll Free) | 866-776-2199 |
| Facsimile | 941-776-2199 |
| e-mail | ltlinc@aol.com |

## MISSION STATEMENT

- To provide the most comprehensive database of transcripts available anywhere.

- To provide keyword search capability to greatly reduce the number of transcripts our subscribers need to access.

- To provide our subscribers with transcripts which can be immediately downloaded or e-mailed to them.

- To provide transcripts in an easy to read condensed format together with a hyper-linked word index.

- To maintain our web-site as a cooperative effort with the medical defense community.

- To link our site with many of the other entities providing similar and other legal research services.

Legal Transcript Library, Inc. was incorporated in July, 1996 as part of a cooperative effort with the New York State Medical Defense Bar Association, several major insurance carriers, and New York law firms representing the medical defense community.

The primary function of LTL, Inc. is to coordinate the significant effort required to obtain and convert existing and future transcripts of expert testimony, on a continuing basis, for use by the medical defense community including law firms engaged in the defense of medical malpractice cases, and their clients.

Prior to the creation of this web-site, LTL, Inc. provided to our subscribers, on a quarterly basis, CD-ROM disks containing indexed transcripts of experts' testimony. By providing this central database and a faster and more convenient method of accessing transcripts, we facilitated the laborious task of searching for and reading through hundreds of pages of testimony.

Many of the most prominent medical defense law firms in New York have subscribed to our service and continue to comment favorably. With this web-site, we are addressing the needs of law firms throughout the country by expanding our expert database to include those experts who testify in all geographic areas. We have already converted thousands of transcripts, incorporating testimony of hundreds of experts.

Return to top of page

VOLUME:   I
PAGES:    108
EXHIBITS:  8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.: 04-12371-MLW

LAUREN IBBOTSON,
        Plaintiff
    VS.
CINDY J. HUSTEAD FELDMAN,
PETER FESCOE and ARBELLA
MUTUAL INSURANCE,
        Defendants

DEPOSITION of EDWARD TARLOV, M.D.,
taken on behalf of the Defendants, pursuant to
the Federal Rules of Civil Procedure, before Rita
C. Donovan, a Registered Professional Reporter
and Notary Public within and for the Commonwealth
of Massachusetts, at the offices of Lahey Clinic,
41 Mall Road, Burlington, Massachusetts, on
Monday, November 7, 2005 commencing at 4:33 p.m.

Hennessey Corp., d/b/a
Robert H. Lange Company
50 Congress Street
Boston, Massachusetts 02109
617.523.1874***800.645.6807***Fax 617.523.7343

---

Page 3

1           I N D E X
2   WITNESS        DIRECT CROSS REDIRECT RECROSS
3   Edward Tarlov    4    22    104    106
4
5
6
7
8
9
10
11
12          E X H I B I T S
13   NUMBER        DESCRIPTION         PAGE
14    1   AANS.org Database             29
15    2   Physician Profile            32
16    3   Guides to Evaluation         52
17    4   Regional Orthopedic Tests    61
18    5   Segment Instrumentation ---  84
19    6   Long-Term Follow-Up Results  85
20    7   Report of Dr. Tarlov         90
21    8   MRI Report                   90
22    9   Spine Journal                90
23
24

---

Page 2

1   APPEARANCES:
2
    BRIAN CUNHA & ASSOCIATES
3   (BY:  Brian R. Cunha, Esq.)
    311 Pine Street
4   Fall River, MA 02720
    508.675.9500
5   on behalf of the Plaintiff;
6
7   WESTON, PATRICK, WILLARD & REDDING
    (BY:  Ronald E. Harding, Esq.)
8   84 State Street
    Boston, MA 02109
9   617.742.9310
    on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1               P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are now on the
3   record.  My name is Jason Lachapelle.  I am a
4   legal video specialist for Hennessey Corporation
5   doing business as R. H. Lange Company.  Our
6   business address is 50 Congress Street, Boston,
7   Massachusetts, 02109.  Today is November 7th,
8   2005 and the time on the video monitor is 4:33
9   p.m.
10          This is the deposition of Edward
11   Tarlov, M.D. in the matter of Lauren Ibbotson
12   versus Cindy J. Hustead Feldman and Peter Fescoe,
13   in the United States District Court for the
14   District of Massachusetts, Case Number
15   04-12371-MLW.  This deposition is being taken at
16   the Lahey Clinic, 41 Mall Road, Burlington,
17   Massachusetts on behalf of the defendant.  The
18   court reporter is Rita Donovan.  Counsel will
19   state their appearances and the court reporter
20   will administer the oath.
21          MR. HARDING:  My name is Ronald
22   Harding and I represent the defendants Cindy J.
23   Hustead Feldman and Peter Fescoe.
24          MR. CUNHA:  My name is Brian Cunha,

Page 9

1  estimate you have done throughout your career?
2  A. Throughout my career, which has spanned nearly 40
3     years, 30, nearly 30 years here at the clinic at
4     the rate of about probably 300 operations a year,
5     that would be three thousand --
6  Q. A large number?
7  A. Probably 12 to 15 thousand operations of
8     something in that ball park.
9  Q. Now, at some point did you have an opportunity to
10    review medical records concerning Lauren
11    Ibbotson, the plaintiff in this case?
12 A. Yes, I did.
13 Q. Do you recall what records you reviewed?
14 A. There were records of -- I didn't list the
15    records on this form and I sent them back to Mr.
16    Cosgrove after I had looked at them because they
17    were quite voluminous. There was a binder of
18    about that thick of medical records that
19    included, excuse me, I think they included her
20    initial evaluations, her first hospitalization at
21    the Rhode Island Hospital, her second
22    hospitalization when Doctor Harrington removed
23    some of the hardware and treated the infection,
24    and there were other materials relating to her

Page 10

1  follow-up and her evaluations there.
2  Q. And at some later point in time after reviewing
3     those records or at the same time, did you have
4     an opportunity to examine Lauren Ibbotson?
5  A. Yes, Lauren came to my office on the 31st of
6     October this year, just barely more than a week
7     ago, and I examined her in the office then. She
8     flew up from North Carolina.
9  Q. Was that done at the request of the defendants in
10    this case?
11 A. Yes, it was.
12 Q. Have the defendants agreed to compensate you for
13    your time in examining Lauren and in testifying
14    here today?
15 A. Yes.
16 Q. At what rate have we agreed to compensate you?
17 A. At the rate of $450 an hour.
18 Q. Thank you. When Lauren came in to see you, did
19    you take a history from her?
20 A. Yes.
21 Q. Can you tell us what history you obtained from
22    Lauren?
23 A. I got the history that she had been an
24    unrestrained passenger as a high school student

Page 11

1  in a vehicle on May 28th, 2004, that she was,
2  that there was an auto accident, that the driver
3  I believe of the vehicle put his, she remembered
4  he put his hand out to try to protect her in the
5  accident, that she was, that she ended up in the
6  back seat of the car, that her body traveled over
7  the seat into the back seat, and that she was
8  able to move her legs and had no evidence at any
9  point of a neurological injury. She had multiple
10 fractures of her thoracic spine and it got into
11 more of the medical history.
12 Q. From the -- Let's talk about the medical history.
13    From a review of the medical records and from the
14    history that you took from Lauren, did you come
15    to understand what treatment and what her
16    injuries she had as a result of the accident?
17 A. Yes.
18 Q. And can you describe for us what those were?
19 A. Those were multiple fractures in the thoracic
20    spine. They included the transverse processors
21    and the vertebral bodies of T6, T4 and T7. The T
22    stands for thoracic and there are 12 thoracic
23    vertebrae numbering them from the top, so there
24    were three that were fractured and parts of the

Page 12

1  bones that project out to the sides to which
2  muscles were attached were also cracked.
3  Q. Those bones that project out to the side, were
4     those the transverse processors that you
5     described earlier?
6  A. Yes.
7  Q. And perhaps using the skeleton can you
8     demonstrate for the jury the levels at which
9     there were fractures?
10 A. Yes. This is a well worn demonstration of the
11    spine. It goes this way. These are -- The head
12    would be up here.
13        MR. CUNHA: Can you focus on the spine
14    itself?
15        THE VIDEOGRAPHER: The upper part of
16    the spine?
17        MR. CUNHA: Upper.
18 A. Lauren's head would have been up here. These are
19    the collar bones, the clavicles they're called,
20    these are the ribs, these are the scapula, these
21    are the winged bones in the back that you can
22    feel on the back of the shoulders. The arms
23    would be here, and the pelvis would be here, and
24    the legs would come down. These are the ribs,

3 (Pages 9 to 12)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 17

1  a normal physical specimen for a healthy, young
2  women.
3        She has an incision on her back which
4  has healed very well. I could not find a scar
5  from where her chest tube was in place, so that's
6  healed up very nicely, and she's made a full
7  recovery, and I think, I'm sure Doctor Harrington
8  considers this a good result of a rather
9  extensive surgery that she required.
10       MR. CUNHA: Objection. Move to
11  strike.
12  Q. What is range of motion in a medical sense?
13  A. Range of motion refers to the extent to which a
14  joint can move. For example, the arm, the elbow
15  is capable of extension in a normal elbow and of
16  flexion, so it goes from full extension which
17  would be 180 degrees to approximately 30 degrees
18  of flexion. The wrist flexes to about 90
19  degrees.
20       Years ago I broke my wrist, and for a
21  while I felt that I had a little loss of the
22  range of motion, but looking at them I'm trying
23  to remember which wrist was broken. The mobility
24  came back pretty well after a period of time. It

Page 18

1  was the left one, and there might be a slight
2  difference of a degree or two to the extent the
3  wrist flexes or extends, but I have no disability
4  from it. I am able to do surgery and function
5  quite well.
6  Q. With respect to your physical examination of
7  Lauren Ibbotson, did you check the range of
8  motion in her spine?
9  A. Yes.
10 Q. And what were your findings with respect to the
11  range of motion in Lauren's spine?
12 A. She has a normal range of motion of her cervical
13  spine, a normal range of motion of her lumbar
14  spine, the lower back, and a normal range of
15  motion of her thoracic spine.
16       MR. CUNHA: Objection. Move to
17  strike. It is not contained in his report.
18 Q. Doctor, did you come to some conclusions in your
19  physical examination as to whether or not there
20  were any neurological deficits?
21 A. Yes.
22 Q. And what conclusion did you reach with respect to
23  neurological deficits?
24 A. My conclusion is that there were, there are no

Page 19

1  neurological deficits. There is no evidence of
2  any injury to nerves or the spinal cord.
3  Q. Did you make or come to any opinion as to whether
4  or not Lauren Ibbotson had any permanent
5  impairment based upon your examination and review
6  of the medical records?
7  A. Yes.
8  Q. What was your opinion with respect to permanent
9  impairment?
10 A. My opinion is that there is no evidence of any
11  permanent impairment whatsoever.
12 Q. Would that include range of motion?
13 A. Yes.
14 Q. Do you have an opinion as to what her prognosis
15  might be for the future?
16 A. Yes.
17 Q. What is that?
18       MR. CUNHA: Objection.
19 A. I think her prognosis is very good. She is in a
20  course of study aiming to lead to a career in
21  business related restaurant services she told me,
22  and I think the prognosis is very good.
23 Q. Have you had an opportunity to review a report
24  dated April 25th, 2005 by Doctor Barry Superior?

Page 20

1  A. Yes.
2  Q. And directing your attention to that report, does
3  Doctor Superior refer in that report to flexion,
4  extension, rotation of the thoracic spine?
5  A. He does.
6  Q. Do you have some comment with respect to that?
7  A. Yes. He comments that in the thoracic region the
8  patient has zero degrees of flexion, zero degrees
9  of extension, zero degrees of right rotation and
10  zero degrees of left rotation, and --
11 Q. Do you agree with that?
12 A. I am rather surprised by that statement because
13  the thoracic spine really doesn't move to a
14  discernable degree, and I don't know how he could
15  measure movement of the thoracic spine without
16  rather complex radiological x-ray measurements.
17  The thoracic spine stabilizes the ribs, and its
18  main function is to allow you to breathe, and she
19  breathes perfectly normally.
20       There is no significant movement of
21  the thoracic spine in flexion, extension, right
22  or left rotation, so when he concludes that she's
23  impaired based on loss of flexion, extension and
24  rotation, impaired 10 percent, I don't agree with

5 (Pages 17 to 20)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 25

1    take a history from her?
2    A. Yes.
3    Q. Before you began your examination, doctor, is it
4       fair to say that you asked her a number of
5       questions? In fact you refer to them in your
6       report, correct?
7    A. Not exactly. Some of it is before, some of the
8       it is during, and some of it is after the
9       examination.
10   Q. Before you began your examination, doctor, did
11      you take a history, before you did anything, with
12      regard to this patient? Yes or no.
13   A. Yes.
14   Q. Did that take approximately ten minutes?
15   A. I don't know.
16   Q. If I tell you, doctor, if I ask you to assume,
17      doctor, that the patient will testify that the
18      history took approximately ten minutes, would you
19      disagree with that?
20   A. No.
21   Q. And if I tell you, doctor, that the patient will
22      testify that the total period of time you
23      examined her lasted no more than ten minutes,
24      would you disagree with that?

Page 26

1    A. I think so. I think it was longer than that. Of
2       course, if I may continue my answer, Mr. Cunha,
3       when a person, when a normal little girl comes,
4       it doesn't really take that long to see that
5       she's a normal little girl.
6    Q. Okay. I understand.
7    A. If she had some deficit, some complicated,
8       neurological deficit it might take longer.
9            MR. CUNHA: Again, move to strike
10      nonresponsive answer.
11   A. I am responding to your question.
12   Q. If I ask you to assume that there will be two
13      witnesses that will testify that for the time
14      that Lauren entered your office until she left
15      your office was less than 20 minutes, would you
16      disagree with that?
17   A. I don't know. I wasn't taking the time of it.
18   Q. Now, doctor, it is fair to say that you are not
19      the treating physician for this patient, correct?
20   A. Correct.
21   Q. You were not her doctor with regard to treatment,
22      correct?
23   A. Correct.
24   Q. You have been hired by the defendant to testify

Page 27

1    on its behalf, correct?
2            MR. HARDING: Objection.
3    A. No, not correct.
4    Q. You understood when you received medical records
5       from the defense lawyer that you were going to do
6       an evaluation on behalf of the defendant,
7       correct?
8    A. I was asked to give my opinion period.
9    Q. On behalf of the defendant?
10   A. No. I was asked to give my opinion period. My
11      opinion might be favorable to the defendant or it
12      might be favorable to the plaintiff.
13   Q. You understood when you gave your opinion,
14      doctor, that when you gave your opinion it was
15      going to be for the defense, correct.
16   A. No. That is not the arrangement.
17   Q. Did you know that the person that sent you this
18      record represented the defendant in this case?
19   A. Yes, I do know that.
20   Q. In fact, doctor, you are listed and registered in
21      the American Association of Neurological Surgeons
22      surgeon database as available for expert
23      testimony for defendants only, correct?
24   A. Not correct. I have examined patients for the

Page 28

1    plaintiff. I have given my opinion for
2    plaintiffs.
3    Q. I understand, but in the database, doctor, were
4       you registered?
5    A. I don't know. I don't know. I have nothing to
6       do with the database or how it is registered or
7       what anyone puts in there.
8    Q. I am going to show you, doctor, the experts
9       currently listed in the defendant's database and
10      ask you if you are familiar with this particular
11      document?
12           MR. HARDING: Objection.
13   A. No. I'm not.
14   Q. You are --
15   A. I have never seen this.
16   Q. You have never seen that?
17   A. No.
18   Q. You are unaware, doctor, that you are listed in
19      the database of defendant's experts that can only
20      be accessed by defendant's lawyers?
21           MR. HARDING: Objection.
22   A. I am unaware of that.
23   Q. You are unaware of that?
24   A. Yes. And it is not true.

7 (Pages 25 to 28)

Page 33

1    marked for identification.)
2    Q. Doctor, in this particular case you indicate that
3        you received and reviewed some medical records;
4        is that right?
5    A. That's still correct, yes.
6    Q. And those records were afforded to you by
7        Attorney Cosgrove?
8    A. Yes.
9    Q. And you assured Mr. Cosgrove that you would spend
10       whatever time necessary to prepare yourself and
11       to review those records, correct?
12   A. No.
13   Q. You did not tell him you would spend whatever
14       time is necessary in order to properly review
15       those records in order to prepare a report?
16   A. It goes without saying that I would do that, so
17       if it goes without saying I wouldn't say it.
18   Q. And, doctor, you did spend the appropriate amount
19       of time in terms of reviewing those records,
20       correct?
21   A. Yes.
22   Q. You say that was approximately three hours?
23   A. I think so.
24   Q. Have you billed the defendant for that time?

Page 35

1    A. I think that's correct.
2    Q. You never reviewed any CAT scan ever?
3    A. I think that's correct.
4    Q. The only thing that you have evaluated was some
5        written medical reports and hospital records
6        prepared by other physicians; is that correct?
7    A. Yes. And they are perfectly compatible with the
8        descriptions of her injuries and her results and
9        what was found at surgery and how it turned out.
10       If there were anything that did not fit, I would
11       ask for further information, but everything was
12       quite straightforward.
13            MR. CUNHA: Move to strike the
14       nonresponsive part of the answer.
15   Q. Doctor, you also examined this patient not for
16       the purpose of treatment, correct?
17   A. Yes. We covered that, Mr. Cunha.
18   Q. And you don't do examinations just for lawyers,
19       right?
20   A. Correct.
21   Q. You do examinations in the office, right?
22   A. Yes.
23   Q. And you have a standard approach for examining
24       patients, right?

Page 34

1    A. I believe so, yes.
2    Q. How much have you billed him?
3    A. As you said 3 hours at the rate of $450 an hour,
4        $1,350.
5    Q. Has that bill been sent?
6    A. I think so.
7    Q. Have you been paid?
8    A. No, I don't think so.
9    Q. When did you send the bill?
10   A. I don't remember.
11   Q. Did you review any x-rays?
12   A. I don't think so. I don't think I saw the films.
13       I saw the reports of the films.
14   Q. Did you review any MRI's?
15   A. The reports of the images.
16   Q. Did you review any MRI's?
17   A. I reviewed the reports of the MRI's.
18   Q. Did you review any CAT scans?
19   A. I reviewed whatever reports there were.
20   Q. It is fair to say that in terms of rendering an
21       opinion you did not look at one x-ray ever,
22       correct?
23   A. I think that's correct.
24   Q. You never looked at one MRI film ever?

Page 36

1    A. Yes.
2    Q. And you are trained to do that?
3    A. Yes.
4    Q. And one of the first things you do is you take a
5        history, which is what we talked about a little
6        bit earlier, right?
7    A. Yes.
8    Q. And one of the things that you ask of patient is
9        whether or not they have any complaints, right?
10   A. Yes.
11   Q. In this case, you did that, correct? You asked
12       Lauren if she had any complaints, right?
13   A. Yes.
14   Q. And she told you she had complaints of pain,
15       correct?
16   A. Yes.
17   Q. And she told you that she had difficulty carrying
18       books?
19   A. Yes.
20   Q. Right? And she told you that she had pain when
21       she carried books, correct?
22   A. Yes.
23   Q. And you indicated she did, she came in with a bag
24       over her shoulder, correct?

9 (Pages 33 to 36)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 41

1       THE DEPONENT: That is responsive.
2   Q. Doctor, complaints of pain are certainly very
3       important in terms of your examination, right?
4   A. They are not part of the examination. They are
5       part of the history, Mr. Cunha.
6   Q. And as part of your history you want to know what
7       occurred in the accident that brought about the
8       condition for which you are seeing the patient,
9       correct?
10  A. Yes.
11  Q. And you want to know the history of events that
12      brought the patient to you?
13  A. Yes.
14  Q. Did you ask Lauren how fast the other driver was
15      going?
16  A. No.
17  Q. Do you know how fast the driver was going?
18  A. No.
19  Q. Do you know what the mechanism of injury was to
20      her?
21  A. Well, she was thrown over the seat and landed in
22      the back seat of the car.
23  Q. Do you know how that occurred? Do you know what
24      speed the defendant was traveling? Strike that.

Page 42

1       Do you understand, doctor, that Lauren was a
2       passenger in a car operated by the defendant?
3   A. I understand she was a passenger, yes.
4   Q. Do you understand that the car in which she was a
5       passenger was operated by the defendant?
6   A. I don't know.
7   Q. You don't know that?
8   A. I don't know that.
9   Q. Do you know how fast the defendant was going at
10      the time of the accident?
11  A. No.
12  Q. Do you know, were you given any information or
13      did you take information that the defendant hit a
14      guardrail at 60 to 65 miles per hour?
15          MR. HARDING: Objection.
16  A. I don't recall.
17  Q. Doctor, as a result of the accident your
18      understanding is that Lauren was thrown from the
19      front seat to the back seat, correct?
20  A. Yes.
21  Q. As a result of that, you understood that she
22      sustained some very serious fractures in her
23      back; is that correct?
24  A. She sustained some fractures, and her injuries

Page 43

1       could have been more serious but she was lucky.
2   Q. In fact, doctor, you want to know what the
3       mechanism of the injury is, don't you, doctor?
4   A. You usually can't reconstruct that.
5   Q. So you -- That's not important for you to know?
6   A. All information has some importance. There had
7       to be some movement that, some inertia, the
8       forces that caused the fractures. There was a
9       significant force.
10  Q. Do you know what I mean by the expression
11      mechanism of injury?
12  A. Yes.
13  Q. What do I mean by that?
14  A. Whether she twisted, bent or fell, fell from a
15      horse, or landed on her neck, all those things.
16      No movies were taken during the trauma. There
17      are cases in which movies of football players are
18      taken and you see the mechanism of injury, but in
19      an automobile accident you can't obtain that
20      information.
21  Q. Don't you want to know the description of the
22      forces that are involved on the human body at the
23      time the injuries occurred?
24  A. It sounds very learned when you say it that way,

Page 44

1       and it would be like saying aren't you for
2       motherhood and apple pie, but you don't have that
3       information. You have to go on the basis of what
4       you do have, Mr. Cunha.
5   Q. But isn't that important, doctor, in terms of
6       your evaluating the patient?
7   A. It could be important if it is available, but it
8       is not available in most cases.
9   Q. You are saying that information was not available
10      to you from the patient by way of history as to
11      what occurred and what speed the other --
12  A. She went over the seat into the back seat.
13      That's the sum and total of what we know about
14      the mechanism of injury.
15  Q. Now, doctor, as a result of that the patient was
16      taken from the scene of the accident to the
17      hospital; is that correct?
18  A. Yes.
19  Q. Do you know what hospital she went to?
20  A. I don't have a record here. I don't know. I
21      don't remember.
22  Q. Well, was that where the operation was done,
23      doctor, at the hospital --
24  A. I don't recall.

11 (Pages 41 to 44)

1  certain orthopedic tests that are performed to
2  evaluate range of motion? Are you aware of that?
3  A. These are not orthopedic tests. They are just
4  tests to evaluate range of motion. There is
5  nothing specific to orthopedics about that.
6  Q. Are you aware, doctor, that there are specific
7  thoracic orthopedic tests?
8  A. No. I'm not sure -- You would have to show me
9  that to make me familiar with whatever you are
10  referring to.
11  Q. Are you aware, doctor, that there are certain
12  thoracic orthopedic tests that evaluate flexion
13  and extension?
14  A. If you show it to me I will tell you.
15  Q. Just tell me if you are aware of it and then I
16  will show it to you, doctor.
17  A. Not without seeing it, no.
18  Q. Are you aware that there are certain orthopedic
19  tests, doctor, that measure rotation?
20  A. I would have to see them to give my opinion.
21        MR. HARDING: Objection. Can we
22  clarify for the record what extension and
23  rotation are we talking about? An arm? Leg?
24  Hip? Back? Nose?

1        MR. CUNHA: I am talking about
2  thoracic extension and rotation.
3        MR. HARDING: That wasn't in your
4  question.
5  Q. Are you aware of that?
6  A. I would have to see it to give you an answer.
7  Q. Did you perform any orthopedic tests to evaluate
8  flexion or extension of the thoracic region?
9  A. Yes. I watched her and saw her move and looked
10  at that and I don't think there is any limitation
11  of it.
12  Q. So your entire evaluation was based upon watching
13  her?
14  A. Observation, yes. Not entire but some of it was.
15  Q. And with regard to her ability to rotate the
16  thoracic region, was that also based entirely on
17  watching and observation?
18  A. There is very little rotation, flexion or
19  extension of the thoracic spine because the ribs
20  immobilize the thoracic spine.
21  Q. Again, doctor, was that based upon your
22  observation of the patient?
23  A. It's based on a life time of experience with many
24  patients, and including this one.

1  Q. Was it based upon any physical testing performed
2  by you other than observation?
3  A. Yes. I had her flex and extend, move her body,
4  and I watched her breathing.
5  Q. Where is the testing or examination done on
6  flexing and bending in your report, doctor?
7  A. It's not recorded there.
8  Q. Is it recorded anywhere in your report?
9  A. No.
10  Q. Doctor, are you familiar with The Guides to
11  Evaluation of Permanent Impairment?
12  A. Yes. And I and my colleagues don't believe in
13  them. They are not practical, and they are not
14  applicable, and they are frequently not true, and
15  they are often misapplied.
16  Q. Do you understand that the workers' compensation
17  system in the State of Massachusetts regards
18  these AMA guides as a standard relative to
19  evaluation and report of medical impairment?
20        MR. HARDING: Objection.
21  A. I am aware and I don't agree with it. I don't
22  think it's valid.
23  Q. Although Massachusetts requires the physicians
24  that perform evaluations in Massachusetts under

1  the workers' compensation system use these
2  guides --
3  A. There is no such requirement. What you are
4  saying is not true.
5        MR. HARDING: Objection to the
6  question.
7  Q. Would you agree, doctor, that the AMA guidelines
8  are a valuable reference?
9  A. No.
10  Q. So you do not use them?
11  A. Correct.
12        MR. CUNHA: I will mark these are
13  Exhibit Number 3, The Guides to Evaluation of
14  Permanent Impairment.
15        MR. HARDING: Objection but go ahead.
16        (Deposition Exhibit No. 3
17        marked for identification.)
18  Q. Doctor, the guides to evaluation of permanent
19  impairment are guides, doctor, that describe
20  physical impairment levels on the basis of whole
21  body percentages, correct?
22  A. Not correct.
23  Q. Doctor, the percentages in The Guides to the
24  Evaluation of Permanent Impairment are published

|  | Page 57 |
|---|---|
| 1 | abnormalities in the thoracic region, correct? |
| 2 | A. Not correct. You have misrepresented and |
| 3 | misstated what it says there, and the lines you |
| 4 | have underlined in orange which says there are |
| 5 | limited motion of the thoracic spine, there is |
| 6 | very little motion of the thorax spine. In other |
| 7 | words, there isn't much motion of the thoracic |
| 8 | spine. So when you talk about how it's impaired, |
| 9 | if there isn't much motion of the normal thoracic |
| 10 | spine, I'm dazzled by your efforts to make it |
| 11 | sound as if there is impairment if there's little |
| 12 | motion of the thoracic spine. Those move |
| 13 | normally and that's what that says there and I |
| 14 | agree with that part of it. |
| 15 | MR. CUNHA: Move to strike. |
| 16 | Unresponsive. |
| 17 | Q. There is a chapter, doctor, entitled 3.3D, and it |
| 18 | is entitled, Impairments Due to Range of Motion |
| 19 | Abnormalities, Thoracic Region. Did I read that |
| 20 | correctly? |
| 21 | A. I don't know. I can't see it. |
| 22 | Q. Just read it and see if I read it correctly. |
| 23 | A. It says, the thoracic flexion, extension -- |
| 24 | Q. No. Doctor, just -- |

|  | Page 59 |
|---|---|
| 1 | rotation measurement of the thoracic rotation |
| 2 | using a two inclinometer method. Did you -- |
| 3 | A. May I see that? |
| 4 | Q. Yes. |
| 5 | A. It would be impossible to do this. I did not do |
| 6 | it. I didn't do anything impossible, and it |
| 7 | would be impossible to put an inclinometer on the |
| 8 | spine in such a way as to measure rotation. You |
| 9 | would have to cut the spine apart and put the |
| 10 | patient in two halves to do what they are talking |
| 11 | about. It's absurd. |
| 12 | Q. You are saying that the book that is used -- You |
| 13 | are saying that this American Medical Association |
| 14 | book is absurd? |
| 15 | A. Yes. |
| 16 | Q. And, doctor, there is the measurement of the |
| 17 | thoracic spine rotation using a single |
| 18 | inclinometer method? |
| 19 | A. We went over that. |
| 20 | Q. It was double. |
| 21 | A. Single and double, we covered them both. |
| 22 | Q. We are discussing rotation, not flexion or |
| 23 | extension. Did you use this method, doctor? |
| 24 | A. That's what I was just talking about when I |

|  | Page 58 |
|---|---|
| 1 | A. He's interrupting me. What is the question? |
| 2 | Q. The question is very simple. I read the title. |
| 3 | Did I read that correctly to you? Yes or no. |
| 4 | A. It says, Impairments due to range of motion |
| 5 | abnormalities dash thoracic region, and then it |
| 6 | says there is no, there is limited motion of the |
| 7 | thoracic region. |
| 8 | MR. CUNHA: Move to strike the |
| 9 | unresponsive part of his answer. |
| 10 | A. The whole thing was responsive. |
| 11 | Q. We will continue, doctor. And doctor, the, this |
| 12 | chapter discusses the measurements of thoracic |
| 13 | flexion extension using a two inclinometer |
| 14 | method; does it not? |
| 15 | A. Yes. |
| 16 | Q. Did you use an inclinometer to measure the |
| 17 | thoracic flexion of Lauren Ibbotson? |
| 18 | A. No. |
| 19 | Q. And then on the next page they discuss the |
| 20 | measurement of the thoracic flexion, extension |
| 21 | using a single inclinometer method. Did you use |
| 22 | that method to measure? |
| 23 | A. No. |
| 24 | Q. The section also discusses thoracic region |

|  | Page 60 |
|---|---|
| 1 | answered your last question. |
| 2 | Q. Before, doctor, it was a two inclinometer method |
| 3 | and now it is a one inclinometer method. You |
| 4 | employed none of these, did you? |
| 5 | A. Correct. |
| 6 | Q. In fact, doctor, the guides to the evaluation of |
| 7 | permanent impairment goes on to discuss the range |
| 8 | of abnormal motion versus normal motion, correct? |
| 9 | A. I don't know. I haven't used this book, but if |
| 10 | you want me to read it I will read it, but I |
| 11 | don't know. I don't subscribe to it. It's not |
| 12 | practical. |
| 13 | Q. And, doctor, there are also regional orthopedic |
| 14 | tests as well, correct? |
| 15 | A. We already talked about that. |
| 16 | Q. Are you familiar with any of the tests, doctor? |
| 17 | A. Yes. |
| 18 | Q. The Soto Hall test? |
| 19 | A. This is not a reliable or valuable test. I am |
| 20 | familiar with it. |
| 21 | Q. You did not employ it? |
| 22 | A. No. |
| 23 | Q. And there is the Bevors sign test, did you employ |
| 24 | that test? |

15 (Pages 57 to 60)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 65

1    fragments going in both directions, correct?
2    A. Yes, not very far, but they moved in both
3       directions. That's what burst means.
4    Q. At T6?
5    A. Yes.
6    Q. Now at T5, at T7 there was also a burst fracture
7       as well, correct?
8    A. Yes.
9    Q. Would you show the jury where T7 is?
10   A. Right next to T6.
11   Q. Show them on the model. Just show it up -- If
12      you could lift it up? Hold it up the way you did
13      for Mr. --
14   A. This is T6 and this is T7.
15   Q. So T6 had a burst fracture where the fragments,
16      the vertebral body blew apart, fragments forward
17      and fragments back, and the same thing happened
18      at T7 as well, correct?
19   A. Were separated, yes.
20   Q. Well, the fragments of the vertebrae also were
21      pushed forward and backward, correct?
22   A. Right.
23   Q. And with regard to T7 it says that there is 40 to
24      50 percent loss of vertebral body height. What

Page 66

1    does that mean?
2    A. That means Lauren got a little shorter when this
3       happened.
4    Q. What does it mean that when half of the vertebrae
5       is lost, what does that mean?
6    A. It means you lose height.
7    Q. What causes the loss of height?
8    A. The vertebra has collapsed in on itself a little
9       bit.
10   Q. It is fractured so that with regard to T7 half of
11      it is lost, correct?
12   A. Yes.
13   Q. And at T6 how much of the vertebrae was lost?
14   A. I would have to look at the report. Probably
15      somewhat similar.
16   Q. There was more than 50 percent?
17   A. The vertebrae angulates forward and when Doctor
18      Harrington puts his rods in it straightens it up.
19   Q. Talk about the injury itself.
20   A. Yes.
21   Q. The MRI indicated that more than half of the
22      vertebra at T6 was lost, correct?
23   A. Yes.
24   Q. And at T7 40 to 50 percent of the vertebra was

Page 67

1    lost, correct?
2    A. Not the vertebra lost, but there is a loss of
3       height that -- The vertebra is all there so she
4       hasn't --
5    Q. That's because --
6            MR. HARDING: Can he answer the
7       question?
8    A. She hasn't lost the vertebra as Mr. Cunha would
9       like to have us believe. The vertebrae has been
10      crushed slightly, and the treatment has
11      distracted it and corrected that.
12   Q. And just to make sure that the loss of the height
13      is that the vertebra has actually collapsed in
14      itself, correct?
15   A. Not the way you are doing it with your fist, but
16      it's angulated like that. It's -- Wedging is
17      sometimes a word used to describe it. It is what
18      is called a compression fracture.
19   Q. There is a difference between a burst fracture
20      and a compression fracture?
21   A. Not, not in this case.
22   Q. Well, did you look at the MRI reports?
23   A. Yes.
24   Q. Did you look at the MRI's?

Page 68

1    A. We have talked about that, haven't we, Mr. Cunha?
2       I have looked at the reports.
3    Q. So you have no idea, doctor --
4    A. I do have an idea.
5    Q. Wait until I finish my question. You have no
6       idea, doctor, other than a review of the reports
7       themselves as to whether the vertebrae were
8       wedged in on themselves or not, do you?
9    A. The vertebra -- There was no injury of the spinal
10      cord or any nerves.
11   Q. You have --
12           MR. HARDING: Can he answer the
13      question?
14   A. And I have read the report.
15   Q. You have no personal knowledge, doctor, because
16      you did not look at the x-rays, you did not look
17      at the MRI's, whether the, what the burst
18      fractures even looked like, do you?
19   A. Yes, I do. They are described in the reports.
20   Q. Where does it say, doctor, in the reports whether
21      the, whether they were wedged in on themselves or
22      whether they burst outwards?
23   A. Give me the reports.
24   Q. I think it's at the bottom, doctor. Why don't

17 (Pages 65 to 68)

1f7ab8bc-0446-4d40-afae-52ab67643473

| Page 73 | Page 75 |
|---|---|
| 1  A. No. You can't see the end plate. T4 is here. | 1  edema, that's certainly important, correct? |
| 2  Q. Let's go down. T4, T5, T6, T7. So we have | 2  A. That's probably not true because there have never |
| 3  fractures, doctor, at T2, T3, T4, T5, T6 and T7; | 3  been any evidence of any impairment, of any |
| 4  is that accurate? | 4  functions of the spinal cord whatsoever. |
| 5  A. Not quite, no, because they are described as mild | 5  Q. You weren't the treating physician of this |
| 6  and non displaced and so on, so they are pretty | 6  patient, correct? |
| 7  minimal at those levels. | 7  A. We've covered that. That is still the case. I |
| 8  Q. Doctor, if we go onto the MRI it says that at T2 | 8  haven't become the treating physician in the |
| 9  there's a signal hyperintensity in the spinal | 9  interim between when you first asked it and now. |
| 10  cord at T7 T8 likely representing a focus of | 10  Q. Doctor Harrington was the treating physician? |
| 11  spinal cord edema. Do you see that? | 11  A. Correct. |
| 12  A. Yes. | 12  Q. Doctor Harrington not only treated, saw this |
| 13  Q. Now spinal cord edema means spinal cord swelling, | 13  patient, but also operated on this patient, |
| 14  correct? | 14  correct? |
| 15  A. That's what that says. | 15  A. Yes. |
| 16  Q. There is also evidence of edema, which means | 16  Q. And Doctor Harrington would probably be the best |
| 17  swelling, of the interspinous ligaments from the | 17  person to comment with respect to what he |
| 18  T1 to T8 levels with splaying of the spinous | 18  observed during the operation, correct? |
| 19  processes of T4 and T5? | 19  A. Yes. He describes that. |
| 20  A. That's what it says. | 20  Q. In terms of his testimony, that certainly would |
| 21  Q. What is splaying of the spinous processes mean, | 21  be superior to yours in terms of significance of |
| 22  doctor? | 22  any spinal cord edema, correct? |
| 23  A. It means that -- This is an injury where -- | 23  A. I don't know. I don't know. I don't know what |
| 24  Q. Why don't you show them on the model? | 24  his relationship is to you and the patient and so |

| Page 74 | Page 76 |
|---|---|
| 1  A. No. I can show it better this way. The | 1  on. He is a treating physician, so in some ways |
| 2  vertebrae have been angulated forward like that, | 2  he is not necessarily able to be objective. He |
| 3  and there's a tearing of the ligaments that are | 3  is wanting to help his patient. |
| 4  between the processes of the vertebra, and this | 4  Q. I see. So your opinion with respect to what he |
| 5  is part of this kind of an injury. The ligaments | 5  observed in the operation would be superior to |
| 6  attach bones together and the ligaments are | 6  his? |
| 7  strained. | 7  A. No. That is not what I said. |
| 8  Q. There is evidence of a pars intrarticularis | 8  Q. What you are saying is he would be less objective |
| 9  fracture of T6? | 9  with regard to what occurred in the operation |
| 10  A. Yes. | 10  than you? |
| 11  Q. We have another fracture, correct? | 11  A. No. That wasn't what you were talking about. |
| 12  A. Yes. | 12  Q. Doctor, you are not an orthopedic surgeon, are |
| 13  Q. And there are small chip fractures of some of the | 13  you? |
| 14  spinous processes in the upper thoracic spine, | 14  A. No. |
| 15  correct? | 15  Q. You are a neurological surgeon? |
| 16  A. Yes. Luckily most of this is a lot of small chip | 16  A. Right. |
| 17  fractures. | 17  Q. And orthopedic surgeons perform evaluations |
| 18  Q. How many fractures altogether did this patient | 18  similar to what you performed, correct? |
| 19  sustain in her back, doctor? | 19  A. No. |
| 20  A. You would have to count them up. | 20  Q. Orthopedic -- |
| 21  Q. Would you agree it is between nine and ten? | 21  A. Doctor Harrington is a neurosurgeon. I'm a |
| 22  A. Possibly, yes. | 22  neurosurgeon. An orthopedic surgeon is an |
| 23  Q. And as well, doctor, at least on this report at | 23  orthopedic surgeon. |
| 24  T7 T8 likely representing a focus of spinal cord | 24  Q. Orthopedic surgeons conduct orthopedic tests, |

19 (Pages 73 to 76)

1    words.
2    Q. When -- You are saying these aren't your words?
3    A. Correct.
4    Q. When you served as the editor of this book, did
5        you review the information that was --
6    A. Yes. And that's talking about the lumbar spine.
7    Q. Doctor, there are also 266 patients involving
8        pedicle screw fixation. Is it your testimony
9        that all 266 of these patients had lumbar
10       surgery?
11   A. I would say most of them have had lumbar surgery.
12       This is important because the lumbar spine moves
13       and the thoracic spine does not move much, so
14       there's stress on the screws on a lumbar spine
15       that doesn't exist in the thoracic spine.
16   Q. If we assume, doctor, that the thoracic spine
17       does move, would you agree that would be one of
18       the complications that may occur?
19           MR. HARDING: Objection.
20   A. You can't assume that because it isn't the case.
21       You could assume that when I drop a ball it will
22       go up. It doesn't. It is not a fair assumption.
23   Q. Doctor, have there been studies performed with
24       respect to the five year follow-ups in patients

1        that have had thoracic fractures with
2        instrumentation?
3    A. Probably.
4    Q. Are you familiar with any of them?
5    A. Not offhand.
6    Q. Are you familiar with what the percentage of
7        persons are that have hardware complications?
8    A. Let me see what you are looking at.
9    Q. I am asking if you are familiar.
10   A. I don't know.
11   Q. I will show you an article, doctor, and it is in
12       the Spine Journal. Is that journal
13       authoritative?
14   A. No.
15   Q. Is it peer reviewed?
16   A. Yes.
17   Q. And are the articles that appear in that journal,
18       are they peer reviewed before they are published?
19   A. I would have to look at it to tell you that.
20       Yes, this is peer reviewed.
21   Q. Now, doctor, in this particular article it
22       indicates that in this particular study performed
23       by McLain, Burkus and Benson at the Department of
24       Orthopedic Surgery at the Cleveland Clinic

1        Foundation, in an article published in 2001 that
2        55 of the patients with short term pedicle, short
3        segment pedicle instrumentation had greater than
4        10 degrees of sagital collapse during the healing
5        period?
6            MR. HARDING: Objection.
7    Q. Did you hear that?
8    A. I heard that and read it, and it is important
9        because they are talking about a short segment,
10       and this Lauren has a long segment so this has
11       nothing to do with Lauren. Lauren has a rod and
12       multiple pedicle screws and wires to hold them.
13       They are not talking about Lauren here. Even in
14       the patients they are talking about, it is
15       interesting that most of them went back to
16       full-time work.
17   Q. Seventy percent went back to full-time work?
18           MR. HARDING: Objection.
19   A. I think it is more than that.
20   Q. I think it says 70 percent?
21   A. It says 80 percent returned to full-time, were
22       capable of returning to full-time, and 70 percent
23       did so. So it is 80 percent capable of returning
24       to full-time work.

1    Q. What that means is that 20 percent were unable to
2        return to work, correct?
3            MR. HARDING: Objection.
4    A. Yes. And they are talking short segments which
5        again has nothing to do with Lauren.
6    Q. Do they talk about short and long segments,
7        doctor?
8    A. I have to look at it again.
9            MR. HARDING: Objection.
10   A. They say that there have been few studies. They
11       have talked about unstable fractures. They have
12       talked about how more than half had neurological
13       injuries, so this does not sound like Lauren.
14           MR. CUNHA: We will mark this as the
15       next exhibit. You can do that afterwards.
16           (Deposition Exhibit No. 5
17           marked for identification.)
18   Q. I will show you another article, doctor, from
19       Spine in 1995 entitled, Long-term Follow-up
20       Results of Thoracolumbar Fractures After
21       Posterior Instrumentation. Study Design, This
22       retrospective study examined the hospital records
23       of 60 patients for thoracolumbar fractures
24       treated with posterior fusion and spinal

21 (Pages 81 to 84)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 89

1  Q. Did she -- What kind of physical activities was
2     she involved in pre accident?
3  A. She was a runner. That's as far as we went.
4  Q. We know now that she has an approximately 12 inch
5     rod in her back, correct?
6  A. I don't know. I thought the incision was about
7     10 inches long.
8  Q. 10 inch rod?
9  A. The incision. I don't know how long the rod is.
10    Approximately I guess.
11 Q. You are guessing because you haven't looked at
12    the x-rays or MRI's?
13 A. That wouldn't tell us.
14 Q. If I were to look at a x-rays and --
15          MR. HARDING: Let's go off the record.
16    Take a break.
17          THE VIDEOGRAPHER: Going off the
18    record. This is the end of tape number 1 of the
19    deposition of Edward Tarlov, M.D.  The time is
20    6:23.
21          (Recess was taken.)
22          MR. CUNHA: We will mark the MRI
23    report as Exhibit Number 8 and we will mark as
24    Exhibit Number 7 the doctor's medical report

Page 90

1     dated October 31st, 2005, and we will mark the
2     Spine Journal dated 2001 as Exhibit 9, and we
3     will mark the long-term follow-up results as
4     Exhibit, or that's already been marked as Exhibit
5     6.
6          THE VIDEOGRAPHER: We are back on the
7     record. This marks the beginning of the
8     videotape number 2 of the deposition of Edward
9     Tarlov, M.D. The time is 6:30.
10    BY MR. CUNHA:
11 Q. Doctor, I think the last time we were talking
12    before the break was we were discussing the
13    length of the rod or rods in Lauren's back,
14    correct?
15 A. Yes.
16 Q. How many rods are in Lauren's back?
17 A. I have to look at the operative note. I think
18    that it is -- One rod.
19 Q. How many pedicle screws does she have?
20 A. Well, two were removed, and there would be ten.
21 Q. Are you getting that from the report?
22 A. From his description of the operation.
23 Q. Does it say ten screws were inserted?
24 A. No, it doesn't. It doesn't specify the number.

Page 91

1     He says that we found appropriate sites for the
2     screws and inserted screws at T9, 8 and 7. It
3     doesn't say how many.
4  Q. Are you guessing?
5  A. Yes. It would be more accurate to say I don't
6     know. He said we curved a 3/16th inch rod, a
7     rod, to create some degree of correction of the
8     flexion deformity.
9  Q. So is it ten just or you don't --
10 A. I don't know.
11 Q. When you said ten, were you guessing?
12 A. I was starting to assume that he put them on both
13    sides, but he doesn't say that. It's not
14    specific.
15 Q. So you don't know?
16 A. It does not say.
17 Q. The reason you don't know is because you haven't
18    had an opportunity to review the x-rays, correct?
19 A. Well, that would -- If it were important to know
20    how many screws, it would be available from the
21    x-ray, yes.
22 Q. Doctor --
23 A. I don't think it is important.
24 Q. It is fair to say Lauren is a young girl,

Page 92

1     correct?
2  A. Well, she's not as young as she was, but she is
3     younger than you and me.
4  Q. She's 19 and 18 at the time of the accident,
5     right?
6  A. Yes.
7  Q. You understood she was running because you don't
8     know to what level, correct?
9  A. Correct.
10 Q. If I ask you to assume she was a cross-country
11    runner, is it your opinion she could actually
12    participate in cross-country running?
13 A. I don't know. It depends a lot on her emotional
14    state and her willingness to -- Pain is part of
15    running, and I don't know what her aims are in
16    that direction.
17 Q. So you don't have an opinion?
18 A. No.
19 Q. What about, doctor, would she able to play a game
20    of beach volleyball with her friends?
21 A. I imagine she could.
22 Q. So she could go and dive for basketballs with
23    that rod and screws in her back?
24 A. People do do that if they want to.

23 (Pages 89 to 92)

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 97
1    Surgery, edited by Steven Garfin?
2    A. There is a text like that.
3    Q. Are you familiar with this text?
4    A. Yes.
5    Q. Do you consider it authoritative?
6    A. No.
7    Q. Do you have a copy of this text in your library
8        here at the Lahey Clinic?
9    A. No.
10   Q. Do you want to change your testimony?
11   A. In my library you said.
12   Q. I said here at the Lahey Clinic.
13       MR. HARDING: You said your library,
14       Your library at the Lahey Clinic.
15   A. You said do I have a copy in my library. No.
16   Q. It is in the library at the Lahey Clinic,
17       correct?
18   A. Yes.
19   Q. And it's in the neuro sciences library, correct?
20   A. That's what it says there or was before you took
21       it.
22   Q. Before I -- Are you saying I stole it?
23   A. It is not in the library now. It's in your
24       hands.

Page 98
1    Q. Are you familiar with some of the complications
2        that are contained in this particular text?
3    A. I am.
4    Q. And you understand that one of complications is a
5        complication to what they call sublaminar wire
6        passage? Now, you talked about the wire that was
7        used to connect the rods in Lauren's back,
8        correct?
9    A. Yes.
10   Q. That's called sublaminar wire, is it not?
11   A. Yes.
12   Q. And, doctor, there are some complications that
13       can occur with regard to that wire over time?
14   A. Over time?
15   Q. Yes.
16   A. In other words, there are complications that can
17       occur when the wires are put in.
18   Q. Correct.
19   A. And wires can break and be dislodged, yes.
20   Q. And that's one of the complications that's
21       mentioned in your text as well as in this
22       particular text?
23   A. Yes.
24   Q. And, doctor, there's also complications --

Page 99
1    A. And shall we look at that because again most of
2        these complications occur with mobile parts of
3        the spine, with the cervical and lumbar area, and
4        they are unlikely to occur in an immobile
5        thoracic spine, so they are not really relevant
6        to Lauren.
7    Q. Is osteoporosis, doctor, or arthritis an issue
8        that occurs on occasion with persons that have
9        instrumentation in their back?
10   A. Not in this case, no.
11   Q. Is there literature, doctor, to suggest that
12       immediately above or below where the rod is
13       placed places additional stress on the vertebrae
14       in those locations?
15   A. Not in the thoracic spine.
16   Q. You are saying in other areas of the spine that
17       is an issue but not in the thoracic spine?
18   A. Not relevant to Lauren.
19   Q. If there was literature that would suggest
20       otherwise, you would disagree with that
21       literature?
22   A. I would have to look at it.
23   Q. Are you aware of any literature, doctor, that
24       discusses --

Page 100
1    A. I would have to look at it.
2    Q. Without looking at it you are unable to discuss
3        that; is that correct?
4    A. That is correct.
5    Q. When you examined -- And we will get back to
6        that. When you examined Lauren did you notice
7        whether Lauren had any issues with regard to her
8        posture?
9    A. She seemed to have a normal posture.
10   Q. She had normal posture?
11   A. Yes.
12   Q. There was nothing about her shoulders being
13       hunched forward?
14   A. I would say that there are variations in normal
15       posture with whether the shoulders are hunched
16       forward or hunched back.
17   Q. Was there anything in her posture that you noted
18       to be abnormal when you examined her?
19   A. No, nothing.
20   Q. Now, doctor, other than the guides to evaluation
21       of permanent impairment which discusses range of
22       motion, are you aware of any other texts that
23       discuss range of motion other than this
24       particular, of the thoracic spine, other than

1f7ab8bc-0446-4d40-afae-52ab67643473

Page 105

1  those tests sufficient?
2  A. I felt so. I would have asked for the x-rays if
3     I thought there was any doubt.
4  Q. Was it important for you to know what hospital
5     she went to first, second, or third or how she
6     got from one hospital to give us your opinion
7     here today?
8  A. Not at all.
9  Q. In your report, you conclude that there is no
10    objective evidence of any permanent impairment
11    whatsoever. Is that the last sentence in your
12    report?
13 A. It is.
14 Q. And was that based in part on your testing her
15    range of motion?
16 A. Yes.
17         MR. CUNHA: Objection.
18 Q. Was that based in part on your physical
19    examination?
20 A. Yes.
21 Q. Did your physical examination include testing of
22    range of motion?
23 A. Yes.
24         MR. CUNHA: Objection.

Page 106

1  Q. So then is that last sentence not a reflection of
2     what you found in her range of motion?
3  A. Yes.
4         MR. HARDING: Thank you. That is all.
5         RECROSS EXAMINATION
6  BY MR. CUNHA:
7  Q. Why would you test range of motion, doctor, if in
8     fact it is your opinion that the thoracic spine
9     doesn't move?
10 A. Why would I test her range of motion? Because it
11    is -- If I may answer? It is part of my normal
12    examination to see how her neck moves, how her
13    lumbar spine moves, and in the course of bending
14    back and forth I can see whether her thoracic
15    spine moves. If her thoracic spine folded in
16    two, it would be abnormal, but there is no
17    movement of the thoracic spine and the books
18    document that.
19 Q. So you did no testing of her thoracic spine?
20 A. I saw her from various angles during the time I
21    was with her and I watched her walk and I watched
22    her bend and I watched her move, and I saw
23    nothing abnormal about the movement of her
24    thoracic spine.

Page 107

1         MR. CUNHA: Thank you, doctor.
2         THE VIDEOGRAPHER: This marks the end
3  of the videotape number 2 of the deposition of
4  Edward Tarlov, M.D. We are going off the record.
5  The time is 6:53.
6         (Whereupon, the deposition was
7          concluded at 6:53 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 108

1         C E R T I F I C A T E
2
3  COMMONWEALTH OF MASSACHUSETTS
4  ESSEX, SS.
5
6
7         I, Rita C. Donovan, a Registered
8  Professional Reporter do hereby certify:
9         That EDWARD TARLOV, M.D., the witness
10 whose testimony is hereinbefore set forth, was
11 duly sworn by me and that such testimony is a
12 true and accurate record of my stenotype notes
13 taken in the foregoing matter, to the best of my
14 knowledge, skill and ability.
15         IN WITNESS WHEREOF, I have hereunto
16 set my hand this 9th day of November, 2005.
17
18
19
20         Rita C. Donovan
21         Registered Professional Reporter
22
23
24

27 (Pages 105 to 108)

1f7ab8bc-0446-4d40-afae-52ab67643473



American
Association of
Neurological
Surgeons

**Search:**

Keywords / Article ID

**Article ID** find

Home

About AANS

Annual Meetings

Corporate Partners

Education and Meetings

International Activities

Legislative Activities

Library

Media Center

Medical Liability Reform

**Membership**
· Membership Requirements
  & Applications
· Apply Online
· Membership Benefits
· AANS Publications
· Membership Directory
· Surveys/Demographic
  Information
· American Board of
  Neurological Surgery
· Change Your Address
  (Login Required)
· CME Tracking
· CME accepted by AANS
  (PDF)
· Young Neurosurgeons

**Public Resources:**
**NeurosurgeryToday.org**

Residents

Practice Management

About NREF and
Medical Research

Young Neurosurgeons

Subspecialty Sections /
Affiliated Organizations

Site Map

Links

# AANS.ORG



MyAANS.org

Membership

**Career Center**

**View Printer Friendly**      Home | Membership | Membership Benefits

# Membership Benefits



EXHIBIT
Tarlov # 1
R c D 11/7/05

· Public Outreach & Legislative
  Activity
· Scientific Information &
  Continuing Medical Education
· Practice Management Resources
· Professional Services
· AANS E-News
· Neurosurgical Research
· Member Services through AANS
  Partners
· Affiliated Organizations
· Networking & Peer Assistance
· AANS Fact Sheet

## Professional Services

- **Membership Directory**
  Take advantage of the experience of more than 6,500
  neurosurgeons and allied health professionals through
  the members-only Online Directory or AANS
  Membership Directory on CD.

- **AANS Online Career Center**
  AANS is excited to introduce its newest member benefit,
  the AANS Online Career Center. Members can search
  for positions by subspecialty, geographic location, and
  other criteria. Full job descriptions are posted with
  positions updated regularly. Members can post resumes
  and CV's, anonymously if preferred. The Center features
  fellowship listings and grant opportunities. A unique
  conference tool enables job seekers to schedule
  meetings with potential employers during events such as
  the AANS Annual Meeting.

- **MyAANS.org**
  MyAANS.org offers services personalized for each
  member , beginning with the first offering of profile
  preferences (Online Census). Once logged in using a
  username and password, members' customized
  information will appear as a profile. At any time,
  members can make changes to both census information
  and their profile. Password-protected and secure,
  MyAANS.org presents **customized CME reports**,
  enabling members to access and print a copy of their
  **personalized CME transcript** as well as certificates of
  credit from AANS-sponsored and jointly-sponsored
  meetings. Speakers and lecturers can conveniently
  prepare for AANS Meetings by completing and
  submitting customized faculty forms on this site. Watch
  for online voting and online dues-payment beginning in
  2004.

- **Fellowship Directory** for neurosurgeons

- **Subspecialty Sections** Numerous opportunities to
  become involved in subspecialty sections.

- **Expert Witness Testimony Library**
  AANS maintains an Expert Witness Transcript file that
  can be accessed by legal counsel for AANS members

involved in litigation. Contact the AANS Governance Coordinator at 847-378-0500. Other transcripts of expert witness testimony can be located at Legal Transcript Library, Inc.

- **AANS Committees**
  Opportunity to become involved on AANS Committees - Contact the AANS Governance Manager at 847-378-0500.

© Copyright 2004 AANS. All rights reserved.

Disclaimer | Privacy Statement

## Experts Currently in Our Database

Transcripts of expert testimony provided by neurosurgeons (see list at end of this file) can be obtained from the American Association of Neurosurgeons at (847) 378-0507 or visit their website at www.aans.org.

| EXPERT NAME | SPECIALTY |
|---|---|
| Abrahams, James | Neuroradiology |
| Abrams, Arnold | Internal Medicine |
| Abrams, Henry | Urology |
| Abramson, David | Neonatology |
| Acinapura, Anthony | Surgery/Thoracic Surgery |
| Ackerman, Kenneth | Internal Medicine |
| Ackert, John | Gastroenterology |
| Adler, Daniel | Neurology/Pediatric |
| Adler, Jack | Internal Medicine/Pulmonary Medicine |
| Agoliati, Glenn | Internal Medicine |
| Agus, Bertram | Internal Medicine |
| Ahn, Jung | Physical Medicine/Rehabilitation |
| Alcaide, Alexjandro | Obstetrics & Gynecology |
| Aldrete, Jorge | Anesthesiology |
| Alhadeff, Nissam | Obstetrics & Gynecology |
| Allen, Stephen | Obstetrics & Gynecology |
| Alonso, Lita | Pathology |
| Altchek, Albert | Obstetrics & Gynecology |
| Altman, Aaron | Gastroenterology |
| Ambinder, Edward | Oncology |
| Ambrus, Julian | Chemistry/Clinical |
| Amico, Frank | Internal Medicine/Addiction Medicine |
| Andersen, Murray | Surgery/Thoracic Surgery |
| Anderson, Ann | Pathology/Anatomic |
| Anderson, Charles | Neurosurgery |
| Anderson, Douglas | Psychology |
| Anderson, Paul | Neurology |
| Antonacci, Anthony | Surgery |
| Apstein, Michael | Internal Medicine/Gastroenterology |
| Aragona, James | Surgery/Orthopedic Surgery |
| Arici, Aydin | Obstetrics & Gynecology |
| Aronoff, Jeffrey | Surgery/Colorectal Surgery |
| Ashman, Phillip | Urology |
| August, David | Surgery |
| Austin, Donald | Surgery/Neurological Surgery |
| Austin, John | Radiology |
| Axe, Harold | Internal Medicine/Immunology |
| Azar, Anthony | General Medicine |
| Bacal, Darron | Ophthalmology |

| Sosa, Ernest | Urology |
|---|---|
| Sosis, Mitchel | Anesthesiology |
| Spindler, Andre | Internal Medicine/Gastroenterology |
| Spodek, Irving | Obstetrics & Gynecology |
| Sprecher, Stanley | Radiology |
| Stahl, Norman | Ophthalmology |
| Stahl, William | Surgery |
| Stanwyck, T. Scott | Surgery/Orthopedic Surgery |
| Stark, Robert | Internal Medicine/Cardiology |
| Starker, Paul | Surgery |
| Stastny, Peter | Psychiatry |
| Stefanyszyn, Mary | Ophthalmology |
| Stein, Stefan | Psychiatry |
| Stein, Todd | Surgery/Orthopedic Surgery |
| Stellar, Stanley | Surgery/Neurological Surgery |
| Stern, Robert | Obstetrics & Gynecology |
| Sternberg, Emanuel | Emergency Medicine/Surgery |
| Stewart, Charles | Emergency Medicine |
| Stewart, Constance | Pediatrics |
| Stokes, Michael | Pathology/Anatomic/Clinical |
| Stone, Peter | Surgery |
| Storm, Richard | Ophthalmology |
| Strauss, Bernard | Urology |
| Streim, Eugene | Obstetrics & Gynecology |
| Sturm, James | Emergency Medicine |
| Sullivan, Brian | Economist |
| Sultan, Leon | Surgery/Orthopedic Surgery |
| Swan, Kenneth | Gastroenterology |
| Sweeting, Joseph | Internal Medicine |
| Sze, Gordon | Neuroradiology |
| Taff, Ingrid | Neurology |
| Talavara, Wilfredo | Internal Medicine/Pulmonary Medicine |
| Tanowitz, Herbert | Internal Medicine/Infectious Diseases |
| Tarlov, Edward | Neurosurgery |
| Taub, Robert | Oncology/Internal Medicine |
| Teot, Lisa | Pathology |
| Terzian, James | Pathology/Anatomic/Clinical/Forensic |
| Thanning, Lone | Pathology/Anatomic |
| Tiersten, David | Pathology/Anatomic/Clinical |
| Tinari, Frank | Economist |
| Trieger, Norman | Surgery/Oral Surgery |
| Trowers, Reynold | Internal Medicine/Emergency Medicine |
| Tuckfelt, Mark | Internal Medicine |
| Tuerk, Milton | Surgery/Plastic Surgery |
| Tunick, Steven | Surgery/Oral Surgery |



· online services · agencies · elected officials · help

Back | Home | How to Read a Profile

# Massachusetts
# Board of Registration in Medicine
# Physician Profile



## EDWARD C TARLOV MD

### I.    Physician Information

(The information in sections I - V has been provided by the physician.)

| | |
|---|---|
| **License Status:** | Active |
| **License Issue Date:** | 11/05/1986 |
| **Accepting New Patients:** | Yes |
| **Accepts Medicaid:** | Yes |
| **Primary Work Setting:** | Hospital |
| **Business Address:** | LAHEY CLINIC FOUNDATION 41 MALL ROAD BURLINGTON, MA   01803 |
| **Phone:** | (781) 273-8644 |
| **Translation Services Available:** | None Reported |
| **Insurance Plans Accepted:** | None Reported |
| **Hospital Affiliations:** | Lahey Clinic |

*EXHIBIT*

*Tarlov # 2*
*RCD  11/7/05*

### II.    Education & Training

| | |
|---|---|
| **Medical School:** | Pritzker School of Medicine, University of Chicago |
| **Graduation Date:** | 1965 |
| **Post Graduate Training:** | None Reported |

### III.    Specialty

| | |
|---|---|
| **Area of Specialty:** | Neurological Surgery |
| **ABMS Board Certification:** | Neurological Surgery |

### IV.    Honors and Awards

PRESIDENT, NEW ENGLAND NEUROLOGICAL SOCIETY, 1987
PRESIDENT, SPINE SECTION OF THE AMERICAN ASSOC OF
NEUROLOGICAL SURGEONS AND CONGRESS OF
NEUROLOGICAL SURGEONS, 1994

## V.    **Professional Publications**

54 ARTICLES ON NEUROLOGICAL SUBJECTS

## VI.    **Malpractice Information**

Some studies have shown that there is no significant correlation between malpractice history and a doctor's competence. At the same time, the Board believes that consumers should have access to malpractice information. In these profiles, the Board has given you information about both the malpractice history of the physician's specialty and the physician's history of payments. The Board has placed payment amounts into three statistical categories: below average, average, and above average. To make the best health care decisions, you should view this information in perspective. You could miss an opportunity for high quality care by selecting a doctor based solely on malpractice history. When considering malpractice data, please keep in mind:

- Malpractice histories tend to vary by specialty. Some specialties are more likely than others to be the subject of litigation. This report compares doctors only to the members of their specialty, not to all doctors, in order to make individual doctor's history more meaningful.
- This report reflects data for the last 10 years of a doctor's practice. For doctors practicing less than 10 years, the data covers their total years of practice. You should take into account how long the doctor has been in practice when considering malpractice averages.
- The incident causing the malpractice claim may have happened years before a payment is finally made. Sometimes, it takes a long time for a malpractice lawsuit to move through the legal system.
- Some doctors work primarily with high risk patients. These doctors may have malpractice histories that are higher than average because they specialize in cases or patients who are at very high risk for problems.
- Settlement of a claim may occur for a variety of reasons which do not necessarily reflect negatively on the professional competence or conduct of the physician. A payment in settlement of a medical malpractice action or claim should not be construed as creating a presumption that medical malpractice has occurred.

You may wish to discuss information provided in this report, and malpractice generally, with your doctor. The Board can refer you to other articles on this subject.

| | |
|---|---|
| **Dr's Specialty:** | Neurological Surgery |
| **Number of MA Physicians Licensed in this Specialty:** | 163 |
| **Number Who Made Malpractice Payments in the Last Ten Years:** | 59 (36.2 %) |
| **Number of Payments for this Doctor:** | 1 |

| **Payment Details for this Doctor:** | Date<br>5/23/2001 | Category of Payment<br>Average |
| --- | --- | --- |

## VII.    Disciplinary and/or Criminal Actions

A. Criminal Convictions, Pleas and Admissions:
The information in this section may not be comprehensive. The courts are now required by law to supply this information to the Board.

**Dr. TARLOV has had no criminal convictions in the past ten years.**

B. Hospital Discipline:
This section contains several categories of disciplinary actions taken by Massachusetts hospitals during the past ten years which are specifically required by law to be released in the physician's profile.

**Dr. TARLOV has no record of hospital discipline in the past ten years.**

C. Board Discipline:
This section includes final disciplinary actions taken by the Massachusetts Board of Registration in Medicine during the past ten years.

**Dr. TARLOV has not been disciplined by the Board in the past ten years.**

Additional information about a physician, including
closed complaints, may be available by calling the
Massachusetts Board of Registration in Medicine
Phone 617-654-9830
Toll Free Number (Massachusetts only) 1-800-377-0550

Return to
Physician Profile Search
Direct questions and comments about these results to
Massachusetts Board of Registration in Medicine
560 Harrison Avenue, Boston MA 02118
Phone 617-654-9800
For direct response please use Email

Please read the Board of Registration in Medicine Disclaimer



©2003 Commonwealth of Massachusetts                    privacy policy    site map    terms of us

  National Library of Medicine  My NCBI [?] [Sign In] [Register]

All Databases    PubMed    Nucleotide    Protein    Genome    Structure    OMIM    PMC    Journals    Books

Search PubMed ▼ for [            ]    Go  Clear



Limits    Preview/Index    History    Clipboard    Details

Display Abstract ▼    Show 20 ▼ Sort by ▼ Send to ▼    *Taylor # 6*
*R:B  11/7/05*

All: 1    Review: 0  ✖

About Entrez

Text Version

Entrez PubMed
Overview
Help | FAQ
Tutorial
New/Noteworthy
E-Utilities

PubMed Services
Journals Database
MeSH Database
Single Citation Matcher
Batch Citation Matcher
Clinical Queries
Special Queries
LinkOut
My NCBI

Related Resources
Order Documents
NLM Mobile
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

☐ **1:** Spine. 1995 Aug 1;20(15):1704-8.                Related Articles, Links

## Long-term follow-up results of thoracolumbar fractures after posterior instrumentation.

### Tasdemiroglu E, Tibbs PA.

Department of Surgery, University of Kentucky College of Medicine, Lexington, USA.

STUDY DESIGN. This retrospective study examined the hospital records of 60 patients with thoracolumbar fractures treated with posterior fusion and spinal instrumentation. The mean follow-up period was 66 months. OBJECTIVES. The goal of this study was to evaluate and analyze the long-term outcome and socioeconomic conditions of patients who had sustained a thoracolumbar fracture. SUMMARY OF BACKGROUND DATA. In four patients, additional spinal injuries were detected. Three of the patients evaluated with magnetic resonance imaging showed cord contusion and edema. In six patients, ruptured disc fragments were detected by preoperative magnetic resonance imaging or during surgery. METHODS. Long-term follow-up results in 60 patients with unstable thoracolumbar fractures treated with posterior fusion and spinal instrumentation were analyzed. Neurologic outcomes and independence in function and daily living activities were reviewed. Age, sex, mechanism of injury, associated injuries to the spinal cord, and associated injuries to the spinal cord and other systems were analyzed. Fractures were classified according to the system of Ferguson and Allen. RESULTS. The patients with incomplete spinal cord injury showed significant functional improvement. During the follow-up period, 28 patients showed neurologic improvement. Postoperative complications occurred in 11 patients. Five patients required late rod removal because of rod dislocation. CONCLUSION. Regardless of neurologic recovery, most patients reported some disability, usually caused by pain. Inability to return to alternative jobs resulted from insufficient educational background rather than neurologic dysfunction. Advanced academic achievement was the single most important predictive factor of ability to return to work.

PMID: 7482021 [PubMed - indexed for MEDLINE]

Display Abstract ▼    Show 20 ▼ Sort by ▼ Send to ▼





Tarlov # 7
R.D 11/2/05

G. Rees Cosgrove, M.D. FRCS (C)
Chairman
Department of Neurosurgery

Peter K. Dempsey, M.D.
Vice-Chairman

Stephen R. Freidberg, M.D.
Charles A. Fager, M.D.
Edward Tarlov, M.D.
Robert R. Sparacio, M.D.
Jeffrey E. Arle, M.D., Ph.D
Carlos A. David, M.D.
Subu Magge, M.D.
Chuubo Cai, M.D.

October 31, 2005

41 Mall Road
Burlington, MA 01805
Tel: 781-744-8640
Fax: 781-744-5778

Mr. Martin Cosgrove
*Cosgrove, Eisenberg and Kiley*
803 Hancock Street
PO Box 189
Quincy, MA  02170-0997

### Re: <u>Lauren Ibbotson</u>:

Dear Mr. Cosgrove,

I have reviewed the medical records of Lauren Ibbotson and have examined her here in my office on October 31, 2005.

Ms. Ibbotson was a high school student on May 28, 2004 when she was involved in an automobile accident as an unrestrained passenger. She states that she was thrown over the seat and ended up in the back seat of the car. She sustained thoracic fractures of T6, T4 and T7. There were also fractures of the transverse processes.

In June 2004 Dr. Harrington performed a T3-T8 thoracic fusion with instrumentation. She recovered from the surgery but was readmitted June 13 - June 21, 2004 for treatment of a wound infection. A pneumothorax was found and this likely related to a pedicle screw at T5. Dr. Harrington removed the hardware on June 14, 2004. A course of intravenous antibiotics was given.

Ms. Ibbotson has mad an excellent recovery from what could have been a terrible situation. She was very lucky not to have been paralyzed at the time of the automobile accident. The consequences of the surgery with infection and pneumothorax are part

Mr. Martin Cosgrove
*Cosgrove, Eisenberg and Kiley*
Page 3
October 31, 2005

### Re: Lauren Ibbotson

of the known risks of this type of extensive surgery.

Following discharge from the hospital Ms. Ibbotson took the year off to recover and then entered the Johnson and Wales Business School in North Carolina where she is presently a student. She flew here for the visit. She says she has difficulty carrying books but arrived at my office carrying a heavy bag over her shoulder. She used to be a runner but feels she cannot run as much now. She felt that it was painful to wear a bra but she was wearing a bra at the time of this visit.

The only medications she takes are birth control pills and Ibuprofen. She does not take muscle relaxants, which have been suggested because of their sedative effect.

Previously she had undergone appendectomy for a ruptured appendix. She was home and symptomatic for a week before going to the hospital where the ruptured appendix was diagnosed and surgically treated.

On examination she has a well-healed midline thoracic incision. There is no neurological deficit whatsoever in the cranial nerves or upper or lower extremities. There is no sensory loss around the incision. The incision is about 10 inches long. It is well healed.

She is contemplating a career in a business related to restaurant services.

She sustained multiple thoracic fractures in the automobile accident. Her surgery was complicated by postoperative infection and pneumothorax. Nevertheless, she has made a full recovery from those injuries and does not presently exhibit any neurological deficit whatsoever. Complaints of discomfort and carrying a heavy bag are somewhat tempered by the fact that she arrived here carrying a heavy bag.

All in all, it is my judgment that she has made a remarkably good recovery from her injury. There is no objective evidence of any permanent impairment whatsoever.

Sincerely yours,

Edward Tarlov, MD

ET/js



**EXHIBIT**
Taylor # 8
Rc'd 11/7/05

**RHODE ISLAND HOSPITAL**
**DEPARTMENT OF DIAGNOSTIC IMAGING**
593 Eddy Street
Providence, Rhode Island  02903

---

**FINAL REPORT**

---

Acc#: **108827619**                     MR#: **13702147**          Unit: **MRI**

Name: **IBBOTSON, LAUREN**              X-Ray#: **001020818**
DOB:  **03/08/1986    18Y**             DOE:    **05/29/2004 02:20AM**
                                        Pt class:**E**  NS: **TR4**
                                        Service code: **SUT**
ORD: FRANTZ J GIBBS MD                               **ATT:** GERHARD M FRIEHS MD
     UNIV EMERGENCYMED FNDN                              55 CLAVERICK ST
     593 EDDY STREET
     PROVIDENCE RI 02903                              PROVIDENCE RI 02903

---

**MRI C SPINE W/O CONT**  DOE:**05/29/2004 02:20AM**
**MRI T SPINE W/O CONT**  DOE:**05/29/2004 02:20AM**
**MRI L SPINE W/O CONT**  DOE:**05/29/2004 02:20AM**

Comments: Davol ER / Census #182 / Trauma 4.

**History:**  THE PT IS AN 18 YR OLD FEMALE S/P MULTIPLE TRAUMA FROM MVA
W/COMPLEX T SPINE FX.

**FULL RESULT:**
TECHNIQUE/FINDINGS:  MRI of the cervical, thoracic, and lumbar spine
was performed for evaluation of trauma.

CERVICAL SPINE:  The cervical vertebral bodies and intervertebral disc
spaces appear normal.  There is no evidence of fracture or
subluxation.  The cervical spinal cord is normally outlined and shows
no abnormal areas of increased or decreased signal intensity.

THORACIC SPINE:  There are multiple vertebral body fractures present
in the upper thoracic spine with the most severe injury at the T6 and
T7 levels.

At T2, there is a mild compressive deformity of the anterior superior
endplate with minimal edema and no evidence of retropulsed fragments.

At T3, there is a nondisplaced fracture of the superior endplate.

At T4, there is an acute compressive deformity of the superior
endplate with approximately 20% loss of vertebral body height.  There
is no retropulsion of fragments into the spinal canal.

At T5, there is a nondisplaced fracture of the superior endplate.

At T6, there is a complex burst fracture of the vertebral body with
displacement of fragments anteriorly, as well as mild retropulsion
with fragments marginating the ventral surface of the spinal cord.

**PATIENT:** IBBOTSON              **ORDER#:**90003       **Page 1 of 3**
**MED REC NO:** 13702147

**RHODE ISLAND HOSPITAL**
**DEPARTMENT OF DIAGNOSTIC IMAGING**
593 Eddy Street
Providence, Rhode Island  02903

---

**FINAL REPORT**

---

Acc#: **108827619**

Name:  **IBBOTSON, LAUREN**
DOB:   **03/08/1986   18Y**

ORD: FRANTZ J GIBBS MD
     UNIV EMERGENCYMED FNDN
     593 EDDY STREET
     PROVIDENCE RI 02903

MR#: **13702147**          Unit: **MRI**

X-Ray#:  **001020818**
DOE:     **05/29/2004 02:20AM**
Pt class:**E** NS: **TR4**
Service code: **SUT**
                    **ATT:** GERHARD M FRIEHS MD
                          55 CLAVERICK ST

                          PROVIDENCE RI 02903

---

There is no frank cord compression or central canal stenosis.  There
is greater than 50% loss of vertebral body height at this level.

At T7, there is again a complex burst fracture of the vertebral body
with 40-50% loss of vertebral body height and very minimal
retropulsion of the frature fragment.  There is no significant cord
compression or central canal stenosis.

There is surrounding soft tissue edema in the paravertebral tissues
adjacent to the fractured vertebral bodies.

There is a 3 mm focus of T2 signal hyperintensity in the spinal cord
at T7-T8, likely representing a focus of spinal cord edema.  There is
also evidence of edema in the interspinous ligaments from the T1 to T8
levels with splaying of the spinous processes of T4 and T5, consistent
with tears in the ligaments.  There is evidence of a pars
intraarticularis fracture of T6, and there are small chip fractures of
some of the spinous processes in the upper thoracic spine.

LUMBAR SPINE:  A limited examination was performed with only sagittal
T1, T2 and STIR images being obtained.  No axial images were obtained.

The lumbar vertebral bodies and intervertebral disc spaces demonstrate
normal signal.  There is no evidence of fracture.  The conus
medullaris is at a normal level.

**IMPRESSION:**

1.  MULTIPLE FRACTURES OF THE UPPER THORACIC VERTEBRAL BODIES, MOST
SEVERE AT T6 WHERE THERE IS A COMPLEX BURST FRACTURE WITH GREATER THAN
50% LOSS OF VERTEBRAL BODY HEIGHT AND MILD RETROPULSION OF FRAGMENTS
MARGINATING THE VENTRAL SPINAL CORD, WITHOUT FRANK CORD COMPRESSION OR
CENTRAL CANAL STENOSIS.
2.  COMPLEX BURST FRACTURE OF T7 VERTEBRAL BODY WITH 40-50% LOSS OF
VERTEBRAL BODY HEIGHT AND MINIMAL RETROPULSION OF FRAGMENTS.
3.  3 MM FOCUS OF ABNORMAL T2 CORD SIGNAL AT T7-T8, LIKELY
REPRESENTING A FOCUS OF SPINAL CORD EDEMA.

**PATIENT:** IBBOTSON          **ORDER#:**90003     **Page 2 of 3**
**MED REC NO:** 13702147

RHODE ISLAND HOSPITAL
DEPARTMENT OF DIAGNOSTIC IMAGING
593 Eddy Street
Providence, Rhode Island  02903

## FINAL REPORT

Acc#: **108827619**          MR#: **13702147**          Unit: **MRI**

Name:  **IBBOTSON, LAUREN**          X-Ray#:  **001020818**
DOB:   **03/08/1986   18Y**          DOE:     **05/29/2004 02:20AM**
                                     Pt class:**E  NS: TR4**
                                     Service code: **SUT**
**ORD:** FRANTZ J GIBBS MD                   **ATT:** GERHARD M FRIEHS MD
     UNIV EMERGENCYMED FNDN                  55 CLAVERICK ST
     593 EDDY STREET
     PROVIDENCE RI 02903                     PROVIDENCE RI 02903

4.   EVIDENCE OF A FRACTURE IN THE PARS INTRAARTICULARIS AT T6 AND
INJURY TO THE INTERSPINOUS LIGAMENTS WITH SPLAYING OF T4 AND T5
SPINOUS PROCESSES.
5.   LIMITED EXAMINATION OF THE CERVICAL AND LUMBAR SPINE SHOWS NO
EVIDENCE OF FRACTURE.

AKWAYENA/PEZZULLO


Dictated by: **RAYMOND K AKWAYENA MD**  Pager:
Reviewed by: **JOHN A PEZZULLO MD**  Pager: (401)350-9882
Report proofread by: **JOHN A PEZZULLO MD**
DD:**05/29/2004 01:25PM** DS:**06/03/2004 01:27PM**  DT:**05/29/2004 08:49PM,DMO**
CC:

Taylor # 5
RCD 11/7/05



**NCBI**    **PubMed**    .tional Library of Medicine NLM

My NCBI [?]
[Sign In] [Register]

| All Databases | PubMed | Nucleotide | Protein | Genome | Structure | OMIM | PMC | Journals | Books |

Search [PubMed ▼] for [                    ]    Go | Clear

Limits    Preview/Index    History    Clipboard    Details

**EXHIBIT**

Display [Abstract ▼]    Show [20 ▼]    Sort by [▼]    Send to [▼]

Taylor # 9
RCD 11/7/05

About Entrez

Text Version

All: 1    Review: 0  ☒

Entrez PubMed
Overview
Help | FAQ
Tutorial
New/Noteworthy
E-Utilities

PubMed Services
Journals Database
MeSH Database
Single Citation Matcher
Batch Citation Matcher
Clinical Queries
Special Queries
LinkOut
My NCBI

Related Resources
Order Documents
NLM Mobile
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

☐ **1:** Spine J. 2001 Sep-Oct;1(5):310-23.                    Related Articles, Links

ELSEVIER
FULL-TEXT ARTICLE

### Segmental instrumentation for thoracic and thoracolumbar fractures: prospective analysis of construct survival and five-year follow-up.

**McLain RF, Burkus JK, Benson DR**.

Department of Orthopaedic Surgery, The Cleveland Clinic Foundation, 9500 Euclid Avenue, Cleveland, OH 44195, USA. mclainr@cesmtp.ccf.org

BACKGROUND CONTEXT: Segmental instrumentation systems have replaced nonsegmental systems in all areas of spine surgery. Construct patterns for fracture stabilization have been adapted from deformity experience and from biomechanical studies using nonsegmental systems. Few studies have been completed to validate the use of these implants in trauma or to assess their relative strengths and weaknesses. PURPOSE: To substantiate the safety and efficacy of segmental spinal instrumentation used to treat patients with unstable spinal fractures and to identify successful construct strategies and potential pitfalls. STUDY DESIGN: A prospective, longitudinal single cohort study of patients treated with segmental instrumentation for fractures of the spine. Minimum 2-year follow-up. PATIENT SAMPLE: Seventy-five consecutive patients with unstable fractures of the thoracic, thoracolumbar and lumbar vertebrae, admitted to a level 1 trauma center. All patients sustained high-energy injuries: fifty-five (79%) were injured in motor vehicle accidents, 27 (38%) sustained two or more major additional injuries and 39 (56%) had neurological injuries. OUTCOME MEASURES: Perioperative morbidity and mortality, blood loss, surgical time; postoperative recovery, neurological recovery, complications, thromboembolic and pulmonary disease; long-term outcome measures of fusion, sagittal spinal alignment, construct survival, patient pain and function measures, and return to work and activity. METHODS: A longitudinal, prospective study of surgical outcome after segmental spinal instrumentation. Multifactorial assessment was carried out at prescribed intervals to a mean follow-up of 5 years (range, 2 to 8 years) from the time of surgery. Seventy patients were included in the final analysis. There were 17 thoracic, 36 thoracolumbar and 17 lumbar fractures. RESULTS: At 52 months mean follow-up, 57 of 62 patients (92%) had solid fusion with acceptable spinal alignment. Perioperative complications and mortality were less than expected, based on historical controls matched for injury severity. Rod and hook constructs had 97% good to excellent functional results, with no hardware complications. Six of 11 (55%) patients with short-segment pedicle instrumentation (SSPI) with no anterior column reconstruction had greater than 10

degrees of sagittal collapse during the fracture healing period. Twenty six of 36 neurologically injured patients (72%) experienced (mean) 1.5 Frankel grades recovery after decompression and stabilization. Residual neurological deficit determined return to work: 43 patients (70%) returned to work, 33 without restrictions, 10 with limitations. Five other patients (8%) were fit but unemployed. Fifteen percent experienced some form of hardware failure, but only three (5%) required revision. Hardware complications and fair to poor outcomes occurred after pedicle instrumentation without anterior reconstruction. Patients with anterior reconstruction had 100% construct survival, no sagittal deformity, and less pain. CONCLUSION: Segmental instrumentation allowed immediate mobilization of these severely injured patients, eliminating thromboembolic and pulmonary complications, and reducing overall morbidity and mortality. Segmental instrumentation produced a high rate of fusion with no rod breakage or hook failure. Pedicle screw constructs had a high rate of screw complications associated with anterior column insufficiency, but revision was not always necessary. Eighty percent of these severely injured patients were capable of returning to full-time employment, and 70% did so.

Publication Types:
- Clinical Trial

PMID: 14588307 [PubMed - indexed for MEDLINE]

Display Abstract    ☐ Show 20 ☐ Sort by ☐ Send to ☐



Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Nov 1 2005 04:39:49